**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------X
MANCHANDA LAW OFFICES, PLLC a          :
New York professional limited liability :
Company, and RAHUL MANCHANDA, an       :    CASE NO.:
individual,                            :    07 CV 6708
                                       :
          Plaintiffs,                  :
                                       :    ECF CASE
vs.                                    :
                                       :
XCENTRIC VENTURES, LLC, an Arizona     :    JUDGE STANTON
limited liability company d/b/a        :
RIPOFFREPORT.COM and d/b/a             :
RIPOFF REPORT and d/b/a/               :    FIRST AMENDED
BADBUSINESSBUREAU.COM,                 :    COMPLAINT FOR FALSE
                                       :    ADVERTISING,
and                                    :    DEFAMATION,
                                       :    RACKETEER INFLUENCED
EDWARD MAGEDSON, aka "Ed Magedson,"    :    AND CORRUPT
an individual,                         :    ORGANIZATIONS ACT,
                                       :    BREACH OF CONTRACT,
and                                    :    AND TORTIOUS
                                       :    INTERFERENCE WITH
NITIN RANA, an individual,             :    CONTRACT
                                       :
and John Does #1-4                     :
                                       :
          Defendants.                  :
----------------------------------------X


        Plaintiffs, MANCHANDA LAW OFFICES and RAHUL D. MANCHANDA

("Plaintiffs" or "Manchanda"), through its attorneys, allege this

First Amended Complaint ("FAC") as follows:


                            **Introduction**


        1.   This action arises out of Defendants' operation of

interactive websites with the domain names WWW.RIPOFFREPORT.COM and

WWW.BADBUSINESSBUREAU.COM (the "Websites"), and the posting of defamatory statements on these Websites about Plaintiffs and other legitimate businesses.

2.  As alleged more fully herein, Defendants XCENTRIC VENTURES, LLC and EDWARD MAGEDSON (collectively, the "Ripoff Report Defendants" or "Defendants") extort money from legitimate businesses through the operation of the Websites.

3.  The Ripoff Report Defendants encourage Internet users to publish inflammatory statements concerning legitimate businesses in order to initiate their extortion activities.

4.  Defendant NITIN RANA (hereinafter referred to as "Rana") was one such individual who, encouraged by Defendants' and their Websites, published defamatory statements about Plaintiffs.

5.  The Ripoff Report Defendants then place these defamatory statements throughout the Websites and index the Websites to occupy prominent positions in search engine results lists.  As such, a user searching for information on a legitimate business on a search engine such as Google, is likely to be led to the defamatory statements on the Ripoff Report Defendants' Websites.

6.  Defendants then offer their services to the defamed businesses, for staggering sums of money, purportedly to assist in repairing the businesses' reputations.  When a business pays for

Defendants' service, Defendants remove the defamatory content from the Websites, and replace it with positive content, making the company shine in a sea of negative, defamatory statements about other companies.

## **Jurisdiction**

7.   This Court has subject matter jurisdiction over the federal claims (Claims 1 & 3) under 28 U.S.C. §1331 and 28 U.S.C. §1338(a).   This Court has supplemental jurisdiction over the New York common law claims (Claim 2, Claim 4, and Claim 5) under 28 U.S.C. §1367.

8.   This Court has personal jurisdiction over Defendant EDWARD MAGEDSON ("Magedson") because, pursuant to New York's Long Arm Statute, N.Y. Civ. Prac. L.&R. §302, all claims for relief in this action arise from the following acts of Magedson's, which occurred in New York:

a.   Magedson owns, operates, and controls the Websites, which are interactive websites that directly solicit content from New York residents about New York businesses.   The Websites enable users to search for content specifically about businesses located in New York; and

b.   Magedson has transacted business within the state of New

York and contracted to supply services within the state of New York and to residents of New York, and has derived substantial revenue from services rendered in New York; and

c.    Magedson has committed tortious acts within the state of New York causing injury to persons and property within New York, and expected or should reasonably have expected that his acts would have consequences in New York, and has derived and continues to derive substantial revenue from the interstate or international commerce as a result of his acts.

d.    Magedson, a former resident of New York, has engaged in substantial and not isolated activity within New York.

9.    This Court has personal jurisdiction over Defendant XCENTRIC VENTURES, LLC ("Xcentric") because, pursuant to New York's Long Arm Statute, N.Y. Civ. Prac. L.&R. §302, all claims for relief in this action arise from the following acts of Xcentric's acts:

a.    Xcentric owns, operates, and controls the Websites, which are interactive websites that directly solicit content from New York residents about New York businesses. The Websites enable users to search for content specifically about businesses located in New York; and

b.   Xcentric has transacted business within the state of New York and contracted to supply services within the state of New York and to residents of New York, and has derived substantial revenue from services rendered in New York; and

c.   Xcentric has committed tortious acts within the state of New York causing injury to persons and property within New York, and expected or should reasonably have expected that its acts would have consequences in New York, and has derived and continues to derive substantial revenue from the interstate or international commerce as a result of his acts.

d.   Xcentric has engaged in substantial and not isolated activity within New York.

10.   This Court has personal jurisdiction over Defendant NITIN RANA because Rana is a resident of New York, New York.

**<u>Venue</u>**

11.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because a substantial part of the events giving rise to the claims asserted herein occurred in and are causing injury in the District, including:

a.   Plaintiffs, the subject of the misconduct and tortious acts, reside within the District;

b.   On information and belief, Defendant Rana resides within the District.

c.   Defendants' Websites, which include false and defamatory statements about Plaintiffs, are accessible in this District and were directed at consumers located in this District;

d.   Plaintiffs have experienced injury in the District and the harm suffered by Plaintiffs was felt primarily in this District as a result of Defendants' misconduct, including that some of Plaintiffs' clients, residing in the District, have canceled contracts with Plaintiffs due to the false and defamatory statements made by Defendants;

## Plaintiff Manchanda Law Offices PLLC

12.  Plaintiff Manchanda Law Offices PLLC ("Manchanda") is a professional service limited liability company organized and

existing under the laws of New York, with its principal place of business at 80 Wall Street, Suite 705, New York, New York.

### Plaintiff Rahul Manchanda

13.  Plaintiff Rahul Manchanda is an individual residing in the city, county and state of New York.

### Defendant Xcentric Ventures, LLC

14.  On information and belief, Defendant XCENTRIC VENTURES, LLC is an Arizona limited liability company and the registrant of the domain names RIPOFFREPORT.COM AND BADBUSINESSBUREAU.COM.

15.  Defendant Xcentric has purposefully availed itself of the benefits of conducting business in New York.  Xcentric owns and operates the Websites, which actively encourage New York residents to post information about businesses located in New York. Defendant Xcentric has enabled visitors to the Websites to target their searches on the Webiste to particular states, allowing individuals to target their inquiries to New York only.  On information and belief, Defendant Xcentric has sold "do-it-yourself" guides entitled, "RipOffRevenge," to New York residents, which are marketed and sold via the Websites.

## **Defendant Edward Magedson**

16.   Edward Magedson ("Magedson"), on information and belief, founded, owns and controls the Websites.   On information and belief, Magedson oversees the day-to-day operations of Xcentric and the Websites.

17.   Magedson is a former resident of the state of New York, residing for years in the city of Tupper Lake, New York.  Magedson has operated businesses in the state of New York and has owned property in the state of New York.

18.   Magedson has purposefully availed itself of the benefits of conducting business in New York, on behalf of Xcentric. Magedson controls and operates the Websites, which actively encourage New York residents to post information about businesses located in New York.  Magedson has enabled visitors to the Websites to target their searches on the Website to particular states, allowing individuals to target their inquiries to New York only. On information and belief, Magedson has sold "do-it-yourself" guides entitled, "RipOffRevenge," to New York residents, which are marketed and sold via the Websites.

**Defendant Nitin Rana**

19.  Defendant Nitin Rana ("Rana") is an individual and a resident of New York.

**DOE Defendants**

20.  This First Amended Complaint shall be amended to substitute names of individual or business entities for "Does" in due course, upon the identification of additional defendants through discovery.

**Plaintiffs' Business and Marks**

21.  Plaintiff Rahul Manchanda is an attorney licensed in this state and the founder of Plaintiff Manchanda Law Offices, PLLC. Manchanda represents individual and corporate clients in simple and complex immigration, international law, criminal defense, family law, and civil rights.

22.  To market its business, Manchanda has invested heavily in its service marks, MANCHANDA LAW OFFICES and RAHUL MANCHANDA (the "Marks").  Manchanda has continuously used and conducted business under the Marks in interstate commerce since March 2002, and has

advertised in connection with the Marks throughout the country, including advertising on the Internet.

23. Plaintiff Rahul Manchanda regularly appears as a legal expert on various legal topics on nationally televised programming like CNN, Fox News, MSNBC, the Today Show and other nationally distributed news programs.

24. Through Plaintiffs' continuous and exclusive use of the Marks, the Marks have acquired secondary meaning and goodwill as consumers have come to associate the Marks with Manchanda and Manchanda's services.

25. Since Manchanda began using the Marks, Manchanda's services sold in connection with its Marks have generated millions of dollars in revenue.  Manchanda has devoted and continues to devote considerable time, effort, and money in promoting and marketing his services offered in connection with the Marks.

## The Ripoff Report Defendants' Extortionist Business Model

26. The Ripoff Report Defendants own, operate, and maintain the Websites.

27. The Ripoff Report Defendants' Websites ostensibly

function as consumer rights activist websites, with the stated purpose of giving consumers a voice in disputes with corporations and public figures.  The Ripoff Report Defendants describe the Websites as a "worldwide consumer reporting Website & Publication, by consumers, for consumers, to file & document complaints about Companies or Individuals who ripoff consumers."

28.  The Ripoff Report Defendants urge consumers to post their complaints on the Websites.  After consumers' complaints are screened for personal information and curse words (which are removed), the complaints are posted on the Websites with the expectation that public exposure will apply pressure to the targeted businesses.

29.  The Websites have been in operation since 1998 and receive millions of viewers each week.  Since their inception, the Websites have accumulated almost 8.5 billion page views.

30.  The Websites contain more than one million unique consumer complaints, and receive approximately 500-800 new postings each day.

31.  When a consumer seeks to post a new complaint, he or she must first sign up for an account with the Websites.  However, other than a valid email address, the Ripoff Report Defendants do not verify the authenticity of the personal information provided by

the consumer.

32.   Accordingly, users are able to create multiple identities on the Websites and are able to publish complaints on the Websites anonymously or under misleading identities.

33.   When consumers have finished composing their complaints, they create a title for their complaint and select a category to describe their complaints, such as "Outrageous & Popular Rip-Off." Consumers then simply click on a button to post their complaints on the Websites.   There is no charge for a consumer to post a complaint on the Websites.

34.   The Ripoff Report Defendants encourage consumers to use colorful, and in essence, inflammatory language in their complaints and titles, so as to draw in other viewers.

35.   The Ripoff Report Defendants undertake no efforts to confirm the identity of the individual posting a complaint.

36.   The Ripoff Report Defendants undertake no efforts to confirm the accuracy of a consumer complaint posted on the Websites.

37.   The Ripoff Report Defendants have acknowledged that many of its users may have filed "bogus Reports," or they are "disgruntled employee[s]" or "competitors[s]."

38.  Nonetheless, it is the avowed policy of the Ripoff Report Defendants never to remove any consumer complaint posted on the Websites.  According to the Ripoff Report Defendants, the only way to effectively remove a consumer complaint is to convince the consumer to update the post to include positive statements instead of negative statements.  The Ripoff Report Defendants state on the Websites:  "[e]ven if this means that one or more questionable reports are left up, we think that removal of any reports would ultimately make this site less credible and thus less effective as a tool for educating consumers. That's why we have made this strict policy decision."

39.  The Ripoff Report Defendants realize that a single anonymous individual can post a limitless number of false and defamatory complaints about a legitimate business on the Websites. The Ripoff Report Defendants encourage such postings and urge users to employ colorful, eye-catching, and inflammatory language.  The Ripoff Report Defendants ignore the falsity and defamatory nature of many of these consumer complaints, even when this is expressly brought to their attention.

40.  To market the Websites, the Ripoff Report Defendants integrate Plaintiffs' Marks, and the trademarks of thousands of other legitimate businesses throughout the United States, into the Websites.  The Ripoff Report Defendants then engage in a tactic

commonly referred to as "search engine spam," whereby the Ripoff Report Defendants use third party trademarks, including Plaintiffs' Marks, to cause search engines like Google to index pages for the Website in such search engines.[1]   As a result, when consumers search for the Marks in Google's search engine, Google lists the Websites as one of the top search results.  Consumers then view the consumer complaints on the Websites.  The same is true with the thousands of other third party trademarks that the Ripoff Report Defendants have unlawfully appropriated.

41.   In order to effect their search engine spam strategy the Ripoff Report Defendants strategically requests key trademark data from posters and even suggest specific wording on how to place inflammatory statements in close proximity to trademark references. Thereafter, the Ripoff Report Defendants place a trademark owner's trademark, along with the inflammatory and critical statements, within key parts of the HTML files for Defendants' Websites.  As a result of this "search engine spam" technique, the Defendants' Websites get indexed in Internet search engines according to the aforementioned third party trademarks.  When consumers search for these trademarks, the Websites appear in the search engine query results.

---

[1]    Search engine indexing, also known as web indexing, involves the collection, parsing and storage of data for fast and accurate retrieval. Retrieval of data in an index is reflected, in Internet search engines, as a list of links on a web page in response to a query for a word or phrase.

42.   The Ripoff Report Defendants advertise their Websites as follows: "Your Ripoff Report will be discovered by millions of consumers! Search engines will automatically discover most reports, meaning that within just a few days or weeks, your report may be found on search engines when consumers search, using key words relating to your Ripoff Report."

43.   When an Internet user searches for that company using a search engine, that user is led to the defamatory complaints posted on the Websites.   The legitimate business suffers irreparable injury as a result of thousands if not millions of consumers reviewing the defamatory statement.   The business is compelled to take affirmative steps to combat these statements.

44.   The Ripoff Report Defendants receive countless concerns from businesses that consumer complaints posted on their websites are defamatory and requests that these complaints be removed. However, the Ripoff Report Defendants purportedly refuse to remove any consumer complaint, even if a business demonstrates that the complaint is defamatory.   Instead, the Ripoff Report Defendants urge businesses to sign up for the Ripoff Report Defendants' Corporate Advocacy Program ("CAP") in order to modify the defamatory statements on the Websites into positive statements.

45.   The  Ripoff  Report  Defendants  strongly  encourage

businesses vilified by defamatory criticisms to sign up for their CAP program.  The Websites state: "Turn negative customer service experiences into positive opportunities for your business."

46.  The Ripoff Report Defendants' CAP program ostensibly "[v]erifies all reports and rebuttals, determines the truthfulness of the complaints and exposes those posted erroneously or maliciously" and "[u]pdates all reports with [the business's] commitment to right customer wrongs."  The Ripoff Report Defendants purportedly "use every bit of information at our disposal to determine the truthfulness of the complaints against the company or individual."

47.  Under the CAP program, the Ripoff Report Defendants claim they will verify every consumer complaint by two emails and a phone call.  The Ripoff Report Defendants make this representation even though the Websites do not require a phone number for users to register an account nor any other information that would permit them to locate a poster.

48.  Once the CAP program is initiated, the defamed businesses are conspicuously not involved in, nor copied on, the supposed communications between the Ripoff Report Defendants and the people who posted complaints on the Websites.

49.  In fact, it is unclear that the Ripoff Report Defendants

do anything once a business has signed up and paid for the CAP program, other than take the businesses' money. The Ripoff Report Defendants know that their Websites are replete with defamatory and baseless complaints. And because these posters often provide fictitious contact information, the Ripoff Report Defendants know that they can easily conclude that most if not all of the relevant complaints are unverified, which results in the removal of the defamatory comments from the Websites. According to the Ripoff Report Defendants, this is the only way to modify a defamatory complaint on the Websites.

50. Businesses must pay a "consulting fee" to take part in the CAP program. The Ripoff Report defendants regularly charge businesses that sign up for the CAP program an exorbitant sum of money, up to $50,000 plus an ongoing $1500 a month service fee for CAP's supposedly remedial service.

51. On information and belief, the Ripoff Report Defendants have used and invested the income they have derived through the CAP program into the maintenance, development, and operation of the Websites.

52. In summary, the Ripoff Report Defendants actively encourage consumers to post inflammatory complaints, which the Ripoff Report Defendants recognize will often include defamatory content. The Ripoff Report Defendants also recognize that the

complaints will often be "bogus reports" by "disgruntled employees" or "competitors." The Ripoff Report Defendants have received numerous concerns from numerous businesses about the defamatory nature of the complaints posted on the Websites, and are aware that a large percentage of the postings on the Websites are defamatory. The Ripoff Report Defendants refuse to remove or modify these posts, even when the businesses demonstrate their falsity. Instead, the Ripoff Report Defendants extort the businesses by offering them the exorbitantly expensive CAP service through which the Ripoff Report Defendants ostensibly verify the truthfulness of the consumer complaints. In reality, the Ripoff Report Defendants recognize that most complaining consumers have provided fictitious contact information and/or no contact information and/or will not respond to their supposed inquiries. Accordingly, the CAP program is in actuality a fictitious service, and functions primarily to remove defamatory content from the Websites; statements that the Ripoff Report Defendants already knew were defamatory and available for millions of users to see; and statements that the Ripoff report Defendants have avowed never to remove out of concerns for consumer protection.

53. The Ripoff Report Defendants know that a primary effect of the postings on the Websites will be to damage the goodwill and reputation of the businesses that are maligned, often through defamatory publications, and through the CAP program, the Ripoff

Report Defendants offer a magical cure to this injury.

## **Defamatory Statements Posted about Plaintiffs on the Websites**

54.  On August 22, 2007 at 10:47 a.m. the Defendant Rana posted a report on the Websites, a true and accurate version of which is attached at Exhibit A and incorporated herein by reference.  This report contains the following false and defamatory statements about Plaintiffs:

- Manchanda Law Office is a fraudulent law firm...

- This firm is very dishonest about the hours they charge you.

- They are fraudulent, unprofessional and follow unethical business practices.

- After that you will never be put in touch with the attorney over the phone because they are afraid that you might withdraw your retainer contract.

- Once you have signed the paper work (Retainer) agreement, you are giving them access to your credit card...

- Though I never submitted the basic documentation to them based on which they could built my case, they still charged me.

- On August 25, 2007 at 9:17 a.m. the Defendant Rana posted a report on the Websites, a true and accurate version of which is attached at Exhibit I and incorporated herein by reference.  This report contains the following false and defamatory statements:

- I hope more people come forward...against these cheaters...

- · ...running a chopshop scamming clients.

- · I hope you consider this post...before you go along
  with these scammers...

- · Retainer fee is just a 'start up' fee, and they can
  charge you for whatever they feel like afterwards.

All of these statements are false and defame Plaintiffs, and on
information and belief, Defendant Rana intentionally published
these statements knowing that they were false.


55.  On June 16, 2007 at 2:31 p.m., a yet-to-be-identified Doe
Defendant posted a complaint on the Websites, a true and accurate
version of which is attached as Exhibit B and incorporated herein
by reference.   This report contains the following false and
defamatory statements about Plaintiffs:

- · Please stay away from this law firm, they are cons!

- · They do not know the basic law and rules when it comes
  to i20 student and h1b visas.
- · ...that gives them the power to charge you whatever

  they feel like.

- · I was told verbally that I would only pay one fee for
  what I needed to get done, until I got another bill in
  the mail.


All of these statements are false and defame Plaintiffs, and
on information and belief, the yet-to-be-identified Doe Defendant

intentionally published these statements knowing that they were false.

56.  On June 27, 2007 at 2:00 p.m. a yet-to-be-identified Doe Defendant posted a report on the Websites, a true and accurate version of which is attached at Exhibit C and incorporated herein by reference.   This report contains the following false and defamatory statements about Plaintiffs:

- Please stay away from this law firm, they are cons!
- ...not knowledgeable about simple issues...
- For simple questions these lawyers had to call third parties to confirm it.
- lawyers will never talk to you over the phone

All of these statements are false and defame Plaintiffs, and on information and belief, the yet-to-be-identified Doe Defendant intentionally published these statements knowing that they were false.

57.  On July 10, 2007 at 2:29 p.m. the a yet-to-be-identified Doe Defendant posted a report on the Websites, a true and accurate version of which is attached at Exhibit D and incorporated herein

by reference.   This report contains the following false and defamatory statement about Plaintiffs:

...not knowledgeable about simple issues...

This statement is false and defames Plaintiffs, and on information and belief, the yet-to-be-identified Doe Defendant intentionally published this statement knowing that it was false.

58.  On August 3, 2007 at 7:17 a.m. the a yet-to-be-identified Doe Defendant posted a report on the Websites, a true and accurate version of which is attached at Exhibit E and incorporated herein by reference.   This report contains the following false and defamatory statements about Plaintiffs:

· They charged me for services that they never even did. They even charged me for things that I was doing and not them.

· I totally agree with one of the other victims of this fraud financial scheme that they have no clue what they talking about...

· What they do is criminal offense...

· He is so desperate now that he is trying to sue this website...

· Instead of fixing your problem they will make it more difficult, because they know nothing. HE IS A SCAM PERSON

· ...lawyers will never talk to you over the phone

All of these statements are false and defame Plaintiffs, and on information and belief, the yet-to-be-identified Doe Defendant intentionally published these statements knowing that they were false.

59.  On August 4, 2007 at 8:53 p.m. the a yet-to-be-identified Doe Defendant posted a report on the Websites, a true and accurate version of which is attached at Exhibit F and incorporated herein by reference.  This report contains the following false and defamatory statements about Plaintiffs:

- · ...not knowledgeable about simple issues...
- · For simple questions these lawyers had to call third parties to confirm it.
- · ...lawyers will never talk to you over the phone
- · On August 22, 2007 at 10:35 a.m. the Defendant Rana posted a report on the Websites, a true and accurate version of which is attached at Exhibit G and incorporated herein by reference.  This report contains the following false and defamatory statements:
- · ...not knowledgeable about simple issues...
- · ...lawyers will never talk to you over the phone

All of these statements are false and defame Plaintiffs, and on information and belief, the yet-to-be-identified Doe Defendant

intentionally published these statements knowing that they were
false.

## Plaintiffs' Damages

60.    Plaintiff has suffered significant damages as a
consequence of Defendants' actions.

61.  Multiple clients and potential clients of Plaintiffs have
either declined to enter engagement agreement with Plaintiffs or
have not paid their required deposit to Plaintiffs as a direct
result of Rana's defamatory postings on the Websites.
Additionally, consumers conducting Internet searches for the
Plaintiffs eventually end up on the Websites.  As a result, on
information and belief, many other clients and potential clients of
Plaintiffs have chosen not to do business with Plaintiffs as a
direct result of Rana's defamatory publications on the Websites.

62.  Plaintiffs have also suffered damage as a result of the
Ripoff Report Defendants' extortionist scheme.  Once Rana and other
anonymous users of the Websites published defamatory statements
about Plaintiffs, Plaintiffs were left with a Hobson's choice of
leaving the defamatory postings on the Websites or submitting to
Defendant's extortionist CAP program, whereby Plaintiffs would be

forced to pay an exorbitant sum of money to remove the defamatory content. Because Plaintiffs have not paid the Ripoff Report Defendants their exorbitant CAP program demands, multiple clients and potential clients of Plaintiffs have either declined to enter engagement agreement with Plaintiffs or have not paid their required deposit to Plaintiffs.


### Count I

### False Advertising Under Section 43(a) of the Lanham Act, 15 USC §1125(a) (Against Nitin Rana)


63. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-62.


64. By engaging in the above-described activities, Defendant Rana has made false and misleading representations of fact in commercial promotions or advertising which misrepresent the nature, characteristics, qualities, or geographic origin of Plaintiffs' services and commercial activities, with an intent to influence interstate commerce, all in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B).


65. As a direct and proximate result of the actions, conduct, and practices of Rana alleged above, Plaintiffs have been damaged and will continue to be damaged.

66.  Plaintiffs have no adequate remedy at law.

## Count II

### Common Law Defamation
### (Against Nitin Rana)

67.  Plaintiffs re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-66.

68.  Rana has made false statements regarding Plaintiffs, identified in detail in the above paragraph 54.

69.  All of these statements are false, and Rana knew or should have known they were false when he published them on the Websites.

70.  Rana's statements constitute defamation per se, in that they defame Plaintiffs in their trade.

71.  Rana published these statements on the Websites without any privilege to do so.

72.  As a proximate result of the foregoing acts, Rana has caused actual harm to Plaintiffs, and Plaintiffs have been damaged and will continue to be damaged.

73.  Plaintiffs have no adequate remedy at law.


## Count III

### Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et. seq.* (Against Xcentric Ventures, LLC, Edward Madgeson)

74.  Plaintiffs re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-73.


75.  Defendants Xcentric and Madgeson have engaged in a pattern of racketeering activity, as defined under 18 U.S.C. §1961(1) in violation of 18 U.S.C. §1962(a).


76.  Defendants Xcentric and Madgeson have acquired and maintained an interest in control of the Websites through a pattern or racketeering activity in violation of 18 U.S.C. §1962(b).


77.  Defendants Xcentric and Madgeson have participated in the conduct of the Websites' affairs, and specifically the CAP program, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).


78.  Through their operation of the CAP program as set forth above, Defendants Xcentric and Madgeson have engaged in the extortion and threatened extortion of numerous businesses,

including Plaintiffs.

79.  Defendants Xcentric and Madgeson's extortion of numerous businesses, including Plaintiffs' constitutes Grand Larceny in the Second Degree as defined under New York Penal Law Sections 155.05(e) and 155.40.

80.  Defendants Xcentric and Madgeson actions constitute extortion because they have compelled or induced businesses to deliver money to them by means of instilling in the businesses a fear that, if the money is not turned over, they would cause damage to the businesses' reputation and goodwill and perform other acts calculated to materially harm the businesses.

81.  Under New York Penal Law, Grand Larceny in the Second Degree is a Class C Felony, which is punishable by imprisonment for more than one year.

82.  Defendants Xcentric and Madgeson have used and invested, directly and indirectly, the income derived from their extortionist activity into the operation, maintenance, and creation of the Websites, which are enterprises that are engaged in and affect interstate commerce.

83.   As a result of Defendants Xcentric and Madgeson's racketeering activity, Plaintiffs have been injured in their business, property, and reputation.

## Count IV

### Breach of Contract Under Common Law
### (Against Defendant Nitin Rana)

84. Plaintiffs re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-83.

85.  When Defendant Rana hired Plaintiffs Manchanda Law Offices PLLC and Rahul D. Manchanda as counsel, the parties entered into a retainer agreement (hereinafter referred to as the "contract") which governed all future disputes and stated:

- CONSENT TO SUBMIT FEE DISPUTE TO MEDIATION PURSUANT TO PART 137 OF THE RULES OF THE CHIEF ADMINISTRATOR: Client has been advised of client's right to arbitration of fee disputes under Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR). Client and Attorney agree to attempt to resolve any fee dispute through mediation pursuant to Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR). By signing this agreement, Attorney and Client acknowledge that they have received and read the official written instructions and procedures for Part 137, and Attorney and Client understand that participation in mediation does not waive any of their rights to arbitration under Part 137 in the event that mediation does not result in a final settlement. Attorney and Client further agree that all communications made during or in connection with the mediation process are confidential and shall not be disclosed in any subsequent civil or administrative

proceeding, including any subsequent fee arbitration or trial de novo.

86.  If Defendant Rana believed that Plaintiffs' services were not rendered properly at any point during representation, he was bound by the contract he signed to submit the dispute to the Fee Dispute Committee under Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR).  Instead, Rana chose to defame Plaintiffs on Defendants' Website.  By bypassing the Fee Dispute Committee and binding arbitration, as agreed upon in the contract, Rana's actions constituted Breach of Contract under New York State Common Law.

87.  As a result of Defendant Rana's actions, Plaintiffs have been injured in their business, property, and reputation.

### Count V

### Tortious Interference with a Contract Under Common Law (Against Defendants Xcentric Ventures, LLC, and Edward Magedson)

88.  Plaintiffs re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-87.

89.  After Defendant Rana's defamatory posting on Defendants' website, Defendant Rana was consulted with Magedson and was encouraged by Defendant Magedson and Xcentric Ventures LLC to

contact his credit card company and conduct a "chargeback."  A "chargeback" is when an individual contacts his or her credit card carrier and informs them that an purchase was made on his or her card without permission.  The credit card company in turn contacts the company and refunds the individual the money that was charged. The company can dispute the "chargeback" if they choose, otherwise they lose the money previously supplied to their account.

90.  Upon information and belief, Magedson instructs the readers and users of his website to conduct "chargebacks" against companies that his readers and users are unhappy with.  Shortly after his own posting on the Website, Rana informed his credit card company that Plaintiffs had unlawfully charged his credit card the retainer amount and Rana's credit card company immediately instituted a "chargeback" and refunded Rana's money.  Plaintiffs were forced to spend time and money challenging the "chargeback" with Rana's credit card carrier.

90.  Defendants Magedson and Xcentric Ventures LLC's instruction to Defendant Rana to conduct a "chargeback" as a means of instituting revenge on Manchanda Law Offices constituted Tortious Interference with a Contract under New York Common Law and interfered with Rana and Plaintiff's contract that if any disputes arose, the parties would enter into binding arbitration or allow

the Fee Dispute Committee resolve the issue.

91.  As a result of Defendants actions, Plaintiffs have been injured in their business and property.

## Prayer for Relief

**WHEREFORE,** Plaintiffs respectfully requests judgment as follows:

92.  That the Court enter judgment against Defendant Rana that he has made false and misleading representations of fact in commercial advertising, in violation of 15 U.S.C. §1125(a).

93.  That the Court enter a judgment against Defendant Rana that he has defamed Plaintiffs in violation of New York common law.

94.  That the Court enter judgment against Defendants Xcentric and Madgeson that they have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(a), 1962(b), and 1962(c).

95.  That the Court order a public retraction by the Defendants of the published statements that defame Plaintiffs, identified herein and to be supplemented as discovered.

96.    That the Court issue injunctive relief against Defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, enjoining and restraining them from:

a)    Using in any manner the MANCHANDA LAW OFFICES and RAHUL MANCHANDA service marks, or other service marks of Plaintiffs, alone or in combination with any other words or symbols, or any foreign derivatives or equivalents that are likely to cause confusion, deception or mistake, on or in connection with the advertising, offering for sale, or sale of any product or service that is not Plaintiffs' or not authorized by Plaintiffs to be sold in connection with these service marks.

97.    That the Court order Defendants to pay Plaintiffs' general, special, and actual and statutory damages as follows:

b)    Plaintiff's compensatory damages in an amount according to proof;

c)    Punitive damages in an amount to be determined, but in no case less than treble Plaintiffs' damages;

d)    Plaintiffs' damages and Defendants' profits pursuant to 15 U.S.C. §1117(a).

e)    Such other damages as the Court shall deem to be within the provisions of the Lanham Act.

f)    Interest, including prejudgment interest, on the foregoing sums.

98.  That the Court order Defendants to pay to Plaintiffs both the costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action.

99.    That the Court order such other relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

## REQUEST FOR JURY TRIAL

PLAINTIFFS hereby demand a trial of this action by jury.


Respectfully submitted,


MANCHANDA LAW OFFICES PLLC
80 Wall Street
Suite 705
New York, NY 10005
Telephone: (212) 968-8600
Facsimile: (212) 968-8601


By:  /S/
     Rahul D. Manchanda, Esq.